UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mohamed Ali,

      Plaintiff,

                                     **MEMORANDUM OPINION**
                                        **AND ORDER**
v.                                Civil No. 12-2826 (MJD/LIB)

Electrolux Home Products, Inc.

      Defendant.

_____

      Stephen W. Cooper and Stacey R. Everson, The Cooper Law Firm, Chartered, Counsel for Plaintiff.

      Hal A. Shillingstad and Manish Jain, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Counsel for Defendant.

_____

      This matter is before the Court on Defendant Electrolux Home Products, Inc.'s ("EHP") motion for summary judgment. Also before the Court is Plaintiff's motion to supplement the record.

## I.     Background

      Plaintiff Mohamed Ali began employment with EHP as a general production worker in April 2006. EHP is in the business of manufacturing chest and upright freezers at its manufacturing plant in St. Cloud, Minnesota. There

are approximately 1,100 production employees who work in one of three shifts. These employees are members of District Lodge No. 165 of the International Association for Machinists and Aerospace Workers ("Union").

There are 31 departments throughout the EHP plant, and employees are categorized as general production workers or classified workers along four main manufacturing lines that run throughout the plant. Classified workers are trained, and are paid more to perform advanced tasks. Supervisors and leads are to work together to oversee the employees working on the manufacturing lines.

While working at EHP, Plaintiff applied for and was given several higher paying classified jobs throughout the plant, including spot welder, tube bender machine operator and lead person. He received training for these positions and safety training. There is no evidence that Plaintiff had ever been disciplined prior to his termination.

As a lead person, Plaintiff's duties included ensuring that the changeover of the production line occurred at the right time and was done properly. One of the tasks that is part of the changeover process is adjusting the platform via a locking pin, so the platform can be moved forward or backward as needed to accommodate a different freezer cabinet size. Near the platform, there is a yellow

guardrail that EHP asserts is intended to block off the areas where the moving

track runs under the platform.  EHP further asserts there is no need to be in the

area blocked off by the guard rail to adjust the platform.

### A.    Plaintiff's Injury

On October 5, 2011, while Plaintiff was working the lead person position

during the second shift, the department he was working in conducted a

changeover from manufacturing C-20 freezer chests to C-13 chests.  As part of the

changeover, Plaintiff adjusted the pin, and production on the line was resumed.

Two employees that were stationed on the relevant platform soon noticed that

the units did not appear to be moving properly, and Plaintiff was notified.  What

happened next is disputed by the parties.

EHP asserts that without warning, Plaintiff stepped over the guard rail in

an apparent attempt to move the end of the platform that was not pinned.  The

line then advanced, and a track caught Plaintiff's foot, pulling his ankle under the

platform, causing him to scream.  Plaintiff's supervisor, Brenda Hazelton (now

Antonovich), and at least two other employees, pushed the emergency stop

buttons along the line.  Hazelton then radioed the plant's guard shack to ask that

they immediately call an ambulance.  Because no one answered her radio request,

Hazelton called for an ambulance on her cell phone.

It is Plaintiff's position that after he was notified that something was wrong with the line, Hazelton told Plaintiff that she was concerned about not meeting production targets and ordered Plaintiff to fix the line. Plaintiff asserts that he then stopped the line and asked Hazelton to make sure no one restarted the line until he was finished. Plaintiff asserts that he was very familiar with this particular line and that he had performed changeovers at that location consistent with normal practice and training. He further asserts that he had not performed a lockout/tagout[1] in this location, as there is no place to do so.

EHP disputes that is not possible to lockout/tagout the machine at issue here. EHP asserts the area where Plaintiff was injured can be de-energized and properly locked out by rotating the disconnect lever to the off position and applying a lock and tag on the main panel just five steps away from the workstation platform. (Reply Br., Exs. MM, QQ and L.)

Plaintiff asserts that after putting in the last nut and bolt to complete the repair of the line, the conveyor belt started to move, causing him to fall. Plaintiff

---

[1]A lockout/tagout is where a cover is locked in place over the on/off button to ensure a line is not accidently started.

4

alleges that he saw Hazelton with her hands on the control panel where the stop and start buttons are located.  It is Plaintiff's position that Hazelton is the one who started the line.  Plaintiff claims he yelled at her to turn off the line, but she refused.  Plaintiff further claims that not only did she not stop the line, Hazelton instructed other employees not to help him, telling them to stay away.  She further stated that they needed maintenance to come over to free Plaintiff from the line.  Ultimately, another employee ignored Hazelton's instructions, and turned off the line, and extricated Plaintiff from the line.  Plaintiff further claims that Hazelton instructed that Plaintiff not be taken to the nurse's station, but instead, to her office, and that Plaintiff could walk there himself.  It was Plaintiff that asked that an ambulance be called, and that his coworkers put him in a wheelchair and took him to the nurse's office.

Plaintiff was taken to the hospital, where it was determined that he had a broken ankle.  Plaintiff was placed on worker's compensation leave.  He was not medically cleared to return to work until January 2012.

Following Plaintiff's injury, EHP conducted a "stand down" meeting with employees, and conducted an investigation on the same night as the accident. (Ex. D (Northup Dep. at 53-69).)  EHP interviewed those who witnessed the

5

accident, taking down their statements and inspecting the equipment and area at

issue.  (Id.)  Witnesses reported that they had never seen anyone step over the

guardrail to readjust a platform, and that there was no need to do so because the

adjusting end was on the other end of the platform, and employees Cole and

Roering were already located on that side to provide assistance.  (Ex. Q (Cole

Decl.); Ex. A (Antonovich Dep. Ex. 50).)

After he was cleared to return to work, Plaintiff went to the plant to obtain

a new badge.  Plaintiff was asked to a conference room, at which time Plaintiff

was informed that his employment was terminated.  The decision to terminate

Plaintiff's employment was made by EHP Human Resources Director Beverlee

Steffy[2], in consultation with EHP Labor Relations Manager Kelly Fleming and the

plant's safety manager Klay Northrup.  (Ex. F (Fleming Dep. at 148); Ex. R; Ex. D

(Northrop Dep. at 98-99).)  He was told the reason for his termination was

because EHP found that he intentionally violated safety regulations that could,

and did, result in injury.  At no time was Plaintiff given the opportunity to

present his version of the events immediately preceding his injury.

---

[2]Steffy is deceased.

Plaintiff did not file a grievance to challenge his termination.  He did,

however, write a letter to Fleming, claiming that Fleming had taken him to a dark

room and had conspired with Hazelton to intentionally injure Plaintiff because of

Plaintiff's participation in protests concerning break times to accommodate

Ramadan.  (Ex. C (Plaintiff Dep. Ex. 70).)

### B.      Protests Concerning Break Times During Ramadan

In 2010, Plaintiff and others raised concerns about EHP changing its long-

standing policy of allowing employees to eat and drink on the production floor.

Plaintiff asserts the changes in this policy interfered with Muslim employee's

religious beliefs and practices during Ramadan.

Because employees were no longer able to eat and drink on the production

floor, employees could only eat and drink during scheduled times and in certain

locations away from the production floor.  During Ramadan, Muslims must fast

from sunrise to sunset.  Muslim tradition requires that the fast be broken at a

specific time.  With the new policy, however, Muslim employees could not meet

the time specific requirement of breaking the fast.

In May 2010, a number of Muslim employees met with the Union and

signed a petition seeking a modification of the new policy with respect to the

second shift for the month of Ramadan.  Even though EHP was informed of the

significance of Ramadan and the importance of following religious traditions,

Plaintiff alleges that EHP refused to make any changes to the schedule.

Plaintiff and his coworkers then went to the EEOC, and one of his

coworkers filed a charge of discrimination.  Through the involvement of the

EEOC, in August 2010, EHP agreed to modify the lunch break schedule to allow

Muslim employees to fulfill their religious obligations during Ramadan.

Plaintiff alleges that even though EHP had agreed not to allow its

employees to retaliate against any Muslim employee because of their

involvement in the discrimination charge, in August 2010, EHP fired four

Muslim employees who were allegedly requesting religious accommodations.

EHP asserts these employees were dismissed because they walked off the job.

In July 2011, the Ramadan break schedule was revisited.  EHP asserts that

with respect to the 2010 agreed upon break schedule, a large number of non-

Muslim employees complained[3].  Plaintiff disputes whether a large number of

---

[3]The main complaint from non-Muslim employees was that the Ramadan schedule - which is followed by all employees as all employees must break at the same time - was that it required them to work too long before being allowed a break to eat meals.  The normal schedule allowed for a meal break four hours after start time (7:30) while the Ramadan schedule set the meal break five hours and fifteen minutes (8:45) after start time.  (Ex. M.)

non-Muslims complained, citing the deposition testimony of Union

representative Colleen Murphy-Cooney.  (Plaintiff Ex. 201 (Cooney Dep. at 326-

27).)

The 2010 agreement provided for two ten minute breaks and a 30 minute

meal break.  In consideration of the complaints from non-Muslim employees,

EHP proposed alternative break schedules and asked the union stewards to poll

the Muslim employees in order to determine which of the proposals they felt best

met their needs.  Per EHP, Option Two - which provided for two fifteen minute

breaks and a 20 minute meal break - was chosen by a majority of Muslim

employees[4].

When EHP announced the new 2011 break schedule, 23 Muslim

employees, including Plaintiff, signed a petition that was given to the EEOC,

claiming that EHP had not honored the agreement made in 2010.  (Ex. C (Plaintiff

Dep. Ex. 63).)  Plaintiff also filed an EEOC complaint on September 15, 2011

claiming discrimination/retaliation arising from the protests involving the

Ramadan break schedule.  (Plaintiff Ex. 218.)  EHP responded to the

---

[4]This schedule allowed a fifteen minute break at 6:00, a twenty minute break at 8:45 and a second break at 10:30.  The longer first break allowed non-Muslim employees additional time to eat, so they would not have to wait until 8:45.  (Ex. M.)

petition/EEOC complaint, which was eventually dismissed by the EEOC based on a finding of no probable cause. (Exs. M, N.) Since Ramadan 2011, lunch breaks have returned to 30 minutes. (Ex. 201 (Cooney Dep. at 491.)

### C.    Plaintiff Opposes Discrimination

Plaintiff asserts that he actively worked to assure that Muslim employees were not prevented from fulfilling their legitimate religious obligations. He asserts that he repeatedly spoke with union officials, fellow workers, his supervisors and the EEOC about his concerns and did so in a constructive and appropriate manner. Plaintiff asserts that Fleming was well aware that Plaintiff opposed EHP's handling of the issues surrounding Ramadan.

Plaintiff asserts that when he heard of the 2011 break schedule in late July 2011, he immediately complained about it to union officials Colleen Murphy-Cooney, Union Chairperson Janice Lehr and James Kiser. Plaintiff alleges that following Ramadan in 2011, Fleming tried to get evidence that the production employees supported the change in the break schedules, by having employees sign a petition so stating their support. Plaintiff was asked to present the petition to co-workers, and none of the Muslim employees Plaintiff approached would sign the petition. When Fleming found out that Plaintiff did not obtain any

10

signatures from Muslim employees, he told Plaintiff "today I need you, but tomorrow you might need me."  (Ex. 200 (Plaintiff Dep. at 137, 147, 151-55.)

Plaintiff also alleges that during Ramadan 2011, which took place from August 1 through August 29, 2011, Plaintiff observed a sign hung directly over his work area that stated "Somali people, go back to your country, hungry people.  America is not the place for you guys."  Plaintiff pointed this out to his supervisors, Kerry Erickson and Brenda Hazelton, who responded that there is freedom of speech, and the sign remained in place for two days.  (Plaintiff Ex. 200 (Plaintiff Dep. at 237, 242-43).)

Plaintiff filed this action in November 2012 and asserted seven counts.  In opposition to EHP's motion for summary judgment, Plaintiff indicated that he was withdrawing claims 3, 5, 6 and 7.  The remaining counts are retaliation under Title VII and the Minnesota Human Rights Act ("MHRA"), national origin and religious discrimination under Title VII and the MHRA and Workers' Compensation Retaliation under Minn. Stat. § 176.82.

## II.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material

11

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## III.    Motion to Supplement the Record

After briefing on this motion was completed, Plaintiff filed a motion to

supplement the record, based on late disclosures by EHP of evidence relevant to

the issue of whether Plaintiff was treated differently than similarly situated

persons and a photograph that appears to have been taken in 2014, submitted

with EHP's reply brief.  Plaintiff also seeks to provide deposition testimony of

Kerry Erickson, which deposition was taken with regard to related, but separate

cases against EHP after briefing for summary judgment was completed in this

case.  Finally, Plaintiff asserts that certain discovery requested in this matter was

not turned over by EHP, but was produced in the related and separate cases filed

in Said and Issack, et al., and seeks to supplement this record with such evidence.

EHP objects to this motion. EHP first asserts that Plaintiff did not file the required meet and confer statement, and that a meet and confer did not occur with respect to this motion. EHP further argues that Plaintiff's memorandum of law in support of the motion to supplement constitutes an unsolicited memorandum of law that is prohibited under L.R. 7.1(I), as it was filed without first obtaining Court approval. Finally, EHP does not take issue with allowing Plaintiff to supplement the record to include the late disclosure of comparator evidence. EHP does oppose supplementing the record with evidence produced in separate matters. Further, Plaintiff submitted confidential documents that were produced under a protective order in the separate cases, which precludes its use in this case. EHP asks the Court to deny Plaintiff's motion, and strike docket numbers 70-72.

The Court will grant the motion in part. EHP does not object to supplementing the record with the additional comparator evidence attached to the Everson Declaration as Exhibit AAA. Accordingly, the Court will allow Plaintiff to supplement the record with such evidence.

The remainder of the motion is denied.  Not only was Plaintiff required to meet and confer with EHP prior to filing this motion, Plaintiff was also required to obtain prior court approval.  Plaintiff did not meet either of these requirements.  In addition, the Court finds the Erickson deposition testimony and the email attached as Exhibit DDD are not relevant or probative of any issue in this case.  Plaintiff claims that in his deposition in the Said and Issack matters, Erickson testified that he could not remember whether Plaintiff Ali told him that he had been threatened by Kelly Fleming.  The cited deposition testimony, and the portion submitted with the motion, however, concerns testimony that Erickson cannot recall if there was a lockout/tagout at the location of Ali's injury. See Ex. CCC (Erickson Dep. 62-65.)  As to Plaintiff's Ex. DDD - it is an email discussing protected activity by Ahmed Said.  It does not mention Plaintiff Ali, and is therefore not relevant in this matter.

## IV.    Motion for Summary Judgment

### A.    Count I - Reprisal under MHRA and Title VII

Plaintiff alleges that EHP and employees and/or agents of EHP engaged in a course of retaliation and reprisal against Plaintiff because of Plaintiff's refusal to go along with discriminatory and harassing behavior and because of Plaintiff's

complaints of discrimination and harassment.  As a result, Plaintiff claims he was terminated.

The elements of a prima facie retaliation claim are: 1) Plaintiff engaged in statutorily protected activity; 2) he was subjected to an adverse employment action; and 3) a causal connection existed between the two.  Bahr v. Capella Univ., 788 N.W.2d 76, 81 (Minn. 2010); Evans v. Kansas City, Mo. Sch. Dist., 65 F.3d 98, 100 (8th Cir. 1998).  An adverse employment action is one that "a reasonable employee would have found . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Railway v. White, 548 U.S. 53, 68 (2006).

If Plaintiff establishes a prima facie case of retaliation, the burden then shifts to EHP to produce a legitimate, non-retaliatory reason for its employment actions.  If EHP meets its burden, then Plaintiff must prove that EHP's reasons are a pretext for discrimination.  Clegg v. Arkansas Dep't of Corr., 496 F.3d 922, 928 (8th Cir. 2007) (noting that the McDonnell Douglas framework was to be used to analyze the plaintiff's retaliation claim).  To prove pretext, Plaintiff must both discredit EHP's asserted reasons for its employment actions and show the

circumstances permit drawing a reasonable inference that the real reason for the employment decisions was retaliation.  <u>Gilbert v. Des Moines Area Comm. Coll.</u>, 495 F.3d 906, 918 (8th Cir. 2007).

EHP does not dispute that Plaintiff engaged in statutorily protected conduct in July 2011, when he signed the petition protesting the changes to break time during Ramadan, and that he suffered an adverse employment action.  EHP does argue, however, there is no evidence of a causal connection between the two.  To prove a causal connection under Title VII, Plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  <u>Univ. of Texas S.W. Med. Ctr. v. Nassar</u>, 133 S.Ct. 2517, 2533 (2013).[5]

The Court finds that there are genuine issues of material fact on the issue of causation.  Plaintiff has established that he signed a petition in July 2011 and filed an EEOC complaint on September 15, 2011 challenging the change to the 2011 Ramadan break schedule.  He was then injured on October 5, 2011.  The record

---

[5]No Minnesota state court has yet applied the "but-for" standard to retaliation claims under the Minnesota Human Rights Act.  Prior to <u>Nassar</u>, Minnesota courts applied the motivating factor test to retaliation claims.  <u>See</u> <u>e.g.</u>, <u>McGrath v. TCF Bank Sav., FSB</u>, 509 N.W.2d 365, 366 (Minn. 1993).  Until such time as the Minnesota Supreme Court rules consistent with <u>Nasser</u>, this Court will continue to apply the "motivating factor" standard to all claims asserted under the MHRA.

also demonstrates that EHP had already made the decision to terminate his

employment prior to the January 2012 meeting.  There is thus evidence of a

temporal proximity between Plaintiff's protected conduct and his termination.

As to whether a retaliatory bias existed, Plaintiff testified at his deposition

that after the 2010 agreement about the Ramadan break schedule, supervisors

had warned him that EHP was not happy with Plaintiff and the others for filing a

complaint with the EEOC.  (Plaintiff Ex. 200 (Plaintiff Dep. at 116).)   When

Plaintiff protested the change in the break schedule the following year, and failed

to obtain signatures of Muslim employees approving the change, Plaintiff claims

he was threatened by Fleming.

The Court further finds there are genuine issues of fact as to whether the

reason given for his termination - serious safety violation, failing to

lockout/tagout - is false based on evidence that the machine at issue may not

have had the capacity on the control panel to lockout/tagout.  There are also fact

questions as to whether Plaintiff stepped over the guard rail, and whether

Plaintiff accessed the machine at an appropriate place.

In addition, there are fact questions as to whether Plaintiff turned the

machine off prior to adjusting the pin, and questions as to how the machine was

turned back on - if it was indeed turned off.  These facts questions, together with facts that Plaintiff has an otherwise exemplary work history at EHP and was terminated without being given the opportunity to present his position, could allow a reasonable jury to find that Plaintiff did not violate a safety rule and that the real reason Plaintiff was terminated was retaliation for protesting the 2011 Ramadan break schedule.

Even if Plaintiff did violate a safety rule, Plaintiff has presented evidence that other employees who violated the lockout/tagout rule were not immediately terminated, further calling into question the veracity of EHP's reason for terminating Plaintiff.  (Plaintiff Ex. 212, AAA.)  Plaintiff has also presented evidence that other employees were not terminated for jumping or crossing over guard rails.  (Plaintiff Ex. 213.)  Plaintiff has also presented evidence that EHP did not terminate employees for more serious rules violations, such as crashing a forklift, engaging in horseplay and throwing parts.  (Plaintiff Ex. 214.)

Finally, Plaintiff has presented evidence that EHP employees may have backdated four statements concerning the 2011 complaints about the change to the Ramadan break schedule.  Plaintiff claims that these statements were prepared and signed in December 2011, but made to appear as if they were

18

signed on August 5, 2011.  (Plaintiff Ex. 201H.)

## B.    Count II - Discrimination Based on Religion and National Origin

Discrimination claims under both Title VII and the MHRA can be proven through direct evidence or indirect evidence.  If Plaintiff can provide "direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision" it is the employer's burden to show that it more likely than not would have made the same decision without consideration of an illegitimate factor.  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045-46 (8th Cir. 2005).

"To prove intentional discrimination through direct proof, a plaintiff must establish 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision.'" Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012).

To prove a discrimination claim through indirect evidence, a plaintiff must prove a prima facie case.  "To establish a prima facie case for [] discrimination, a plaintiff "must show (1) he is a member of a protected class, (2) he met his

employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." <u>Gibson</u>, 670 F.3d at 854 (quoting <u>Lake v. Yellow Transp. Inc.</u>, 596 F.3d 871, 874 (8th Cir. 2010)).  Once this showing is made, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  <u>Id.</u>  Once the employer makes this showing, the burden shifts back to Plaintiff to show the employer's proffered reason is pretextual.  "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." <u>Id.</u> (citations omitted).

### 1.    Failure to Accommodate Religious Beliefs

For the reasons set forth above with respect to Plaintiff's retaliation claim, the Court finds that summary judgment is not appropriate with respect to Plaintiff's claim of discrimination based on failure to accommodate religious beliefs.  There are fact questions as to whether EHP followed its disciplinary process when it terminated Plaintiff without providing him an opportunity to

respond to the claim that he violated safety rules.  There are also fact questions

that would allow a jury to reasonably infer discrimination on the basis of

religion, such as Plaintiff's testimony that his supervisors had warned him that

EHP was not happy with his involvement in the protests concerning break

schedules, and that Plaintiff was threatened when he failed to provide signatures

of Muslim employees approving a change in the break schedule.  Further, there is

evidence that other non-Muslim employees may have similarly violated safety

rules, and were not terminated as a result.

### 2.      Discrimination Based on National Origin

Plaintiff claims that he was also discriminated against on the basis of

national origin.  There is no dispute that Plaintiff has demonstrated the first three

elements of a prima facie case of disparate treatment based on national origin: he

is Somali, he was qualified for his position; and he was terminated.  The parties

dispute whether Plaintiff has put forth sufficient evidence which supports an

inference that he was terminated because of his national origin.

In support of this claim, Plaintiff has presented evidence that a sign was

hung in the area where Plaintiff worked stating, *inter alia,* that Somali people

should go home.  Plaintiff asked his supervisors, Brenda Hazelton and Kerry

Erickson to remove the sign, but they initially refused to do so, claiming that it represented freedom of speech.

This evidence, together with the fact questions as to the veracity of the reason given for Plaintiff's termination, is sufficient to withstand summary judgment on the discrimination claim based on national origin.  It is for a jury to decide whether such a sign could hang in a workplace for two days and that management would not be aware of the sign, and to decide the true reason why such a sign would not be immediately taken down and whether such reason played a part in the decision to terminate Plaintiff's employment.

### C.   Count IV - Worker's Compensation Retaliation

A workers' compensation retaliation claim is generally analyzed under the McDonnell Douglas burden-shifting test.  See Randall v. N. Milk Prods., Inc., 519 N.W.2d 456, 459 (Minn. Ct. App.1994).  "A prima facie case of retaliatory discharge under Minnesota law consists of: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two."  Kunferman v. Ford Motor Co., 112 F.3d 962, 965 (8th Cir. 1997) (citation omitted).  If the plaintiff establishes the prima facie case,

the burden of production then shifts to the employer to articulate a legitimate reason for the discharge; and [ ] if the employer articulates a legitimate reason, the burden of production shifts back to the plaintiff to show pretext and the factfinder must determine whether the illegitimate reason (i.e., seeking workers' compensation benefits) was more likely than not the reason for discharge.

Benson v. Nw. Airlines, Inc., 561 N.W.2d 530, 539 (Minn. Ct. App.1997) (citation omitted).

It is undisputed that Plaintiff sought, and received, worker's compensation benefits and was later terminated for committing a serious safety violation. EHP argues that this claim fails because Plaintiff cannot show that his worker's compensation status was a motivating factor in EHP's decision to terminate Plaintiff. EHP again argues that the safety rules are clearly defined as offenses subject to immediate termination, and EHP routinely terminates employees for such violations. EHP also asserts that Plaintiff has received $18,888.63 in worker's compensation payments and $26,201.76 in paid medical expenses.

Plaintiff claims that he was terminated immediately after returning from worker's compensation leave. Plaintiff claims that the reasons for his termination are pretextual, because he did not violate any safety rules and because EHP has not uniformly terminated employees for safety violations.

The Court finds that summary judgment is not appropriate with respect to this claim as Plaintiff has demonstrated that factual disputes exist as to whether the real reason he was terminated was because of his worker's compensation claim.  As set forth above, there are sufficient fact questions as to whether the real reason he was terminated was because he violated the company safety rules. That evidence, together with the fact that he was terminated immediately upon his return to work, raises sufficient fact questions as to whether the real reason he was terminated was, more likely than not, because of his worker's compensation claim.

Accordingly,

**IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion to Supplement the Record [Doc. No. 70] is **GRANTED** with respect to Plaintiff Ex. AAA.  The remainder of the motion is **DENIED**;

2.    Defendant's Motion for Summary Judgment as to Counts 1, 2 and 4 [Doc. No. 48] is **DENIED;** and

3.    Counts 3, 5, 6 and 7 are **DISMISSED**.

Date:   June 30, 2014

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court

Civil No. 12-2826 (MJD/LIB)